The first case this morning is 2011-1078, CLEARVALUE v. PEARL RIVER. Mr. Gallagher, please proceed. Your Honor, good morning. May it please the Court. I have four points I'd like to make this morning if I have the time. But before I get to the specifics, please let me summarize them. First, if one uses the correct legal standard for anticipation and does not consider a teaching away argument, CLAIM 1 of the 690 patent is anticipated by the HASIC 039 patent. Second, even if one credits CLEARVALUE's teaching away argument and claim of unexpected results, CLEARVALUE has failed to overcome the strong prima facie case that CLAIM 1 is obvious. Since CLAIM 1 simply recites the use of a high-molecular-weight DADMACC polymer in combination with ACH, as described in HASIC's examples, and uses that combination to clarify water for having an alkalinity within the alkalinity range. Mr. Gallagher, let me ask you a question. You know there's a claim construction issue here. The argument that the judge should have, as a matter of claim construction, instructed the jury as to the proper way to compute molecular weight. Do we have to get to that issue in order to determine the validity issue? In other words, the anticipation issue? No, you don't. In other words, can we just either way rule on anticipation without addressing that claim construction issue? The claim construction issue provides an independent basis for finding that the high-molecular, or the DADMACC polymers sold by SNF does not infringe CLAIM 1. No, but I'm just thinking just in terms of the anticipation issue. Could one make a ruling on anticipation, one way or the other, without addressing the average? Yes, Your Honor, and my point was that that claim construction issue is an independent basis for a non-infringement argument that we make. But independent of how the court construes molecular weight in connection with CLAIM 1, the court can render the patent anticipated and or obviousness based upon the issues we've presented. Do we have to construe it? Is it possible to say no matter who's right on claim construction, the prior art either anticipates or doesn't? Yes, I believe you can, Your Honor, because the testimony below, and it's set forth in clear values papers on page 7 and 8, and I believe page 48, the same high-molecular weight DADMACC polymer that is recited in the examples of HASIC, the anticipatory reference, was used by the inventor as part of his invention. So however the molecular weight is construed in CLAIM 1, it applies equally to the molecular weight in the HASIC patent. Well, let me just move back then to it, if you've gotten your answer to the question, on anticipation. Because the example in HASIC is 60. Excuse me? The example in HASIC is 60 parts per mole. 60 to 70 ppm, yes, Your Honor. Yes, and the patent itself is 50 or less, right? Yes. So how do you get around ADAFINA, our case, this court's case, which suggests that when you claim a broad range, you're not necessarily anticipating a subsequent claim? Well, I think, you know, if we start getting into whether an earlier genus can anticipate a later species, we have to take a look not only at the prior reference, but at also what the claim is claiming. Now here HASIC broadly describes an alkalinity of less than 150, specific examples 60 to 70. Clear Values' own experts said, or testified at trial, that the alkalinity of 60 to 70 in HASIC's examples, pretty close to the 50 limitation found in CLAIM 1. Moreover, Mr. Hasse, the named inventor of the 690 patent, said that once, or testified, one of ordinary skill in the art would recognize that alkalinity values can be enhanced by almost 60%, so that the value of 30 would inherently include a value of 50. So HASIC is sufficiently narrowed and focused, so one ordinary skill in the art, looking at HASIC in its entirety, would envision the narrower alkalinity range set forth in CLAIM 1 of the 690 patent. So what are the limits? What about a patent that covers 10 parts per million? Would you also, would there be a difference then in the anticipation? Well, I think with that hypothetical, Judge Prost, I think it would be a tougher case, because here we have the testimony of their expert and the named inventor, basically equating 60 with the 50 limitation set forth in CLAIM 1. If we start taking it down further and further away from 60 to 70 in the examples, it's a tougher call. But on the facts in this case, I think the HASIC patent is sufficiently narrowed and focused, so one of ordinary skill in the art would envision that 50 or less limitation set forth in CLAIM 1. Let me move you to another question, which is on the waiver question. Yes, Your Honor. If you recall in the I-4-I case, there was also a problem between the 50-A and 50-B. What's the difference between this case and I-4-I? I presume you find there's a difference, right, because you're saying that— I'm sorry, I'm getting over a call. Your view is that they waived their right to objection. Yes, Your Honor. So is that what makes it different from I-4-I, the absence of objection in I-4-I? I-4-I, there was an expressed waiver, and it was raised below. Here, there was no objection, no waiver argument made in response to our Rule 50-B motion. They provided responses to each of the anticipation and obviousness arguments we raised in our papers below and the same issues that we're raising above before you. They didn't make a waiver argument before Judge Davis, so the fact that they sat on their hands in response to our Rule 50-B motion takes it apart or outside of I-4-I and the Durochem case they cite in their papers. This court in the Fingen case, you know, on point but applying Third Circuit law, which is analogous to the Fifth Circuit law, found that the waiver argument, if they did not make it in response to the Rule 50-B motion, loses that argument and cannot raise that argument for the first time on appeal. So you can waive the waiver? Waive waiver, yes. If we could turn to the issue of anticipation. Here, as we discussed previously, Hasek broadly describes an alkalinity range of less than 150. That encompasses the alkalinity range set forth in Claim 1. Accordingly, there is a strong prima facie case of obviousness here. In fact, the named inventor of the 690 patent, Mr. Hasek, testified at trial that Hasek presented a prima facie case of obviousness. So all clear value is left with is their teaching away argument and claim of unexpected results. Now, if we could address unexpected results first. There was no evidence presented below that using the Claim 1 process provided any results that one skilled in the art would have envisioned to be unexpected. Also, there was no comparison of the Claim 1 process to the closest prior art, which Clear Value's own expert conceded was the Hasek patent. But you've got a jury verdict here, and you've got their expert, Dr. Stoll, and he did testify that Hasek taught away, or at least he provided the basis for that conclusion that Hasek taught that it did not work well at this low level. Am I right? Mr. Stoll testified that Hasek's patent did not teach well when compared to ACH used alone. And there was a jury verdict. But if we look at Example 15, which discloses the combination of ACH and a commercially available DADMACC polymer having a high molecular weight between 1 and 2 million, the results in Example 15 show a 70% improvement in water clarity. Now, how Mr. Stoll could testify that teaches away beyond me, it's a 70% improvement. That is comparable with the improvement you get in Example 1 of the 690 patent. If I could turn briefly to the issue of priority date. Here, when the parent application was filed, the alkalinity range was less than 50. When the CIP application was filed, a new example was added. Example 14. And that broadened the alkalinity limitation from less than 30 to less than 50. Mr. Hasek admitted a trial. The less than 50 limitation wasn't in the parent. Based upon clear values admitted, commercialization in December of 1996 in and of itself is going to invalidate Claim 1. The parent application was filed in September 97. The CIP was filed in August of 98, more than one year before the admitted commercialization of the recited process. If I could turn briefly to the issue of infringement. At trial, Clear Value attempted to present to offer testimony of two purported uses of the Claim 1 process. The first was at the Aragon Refinery located on the Ohio River, and the second was by a company called Altivia, addressing the Aragon Refinery story. In that case, the infringement claim was predicated on the assumption that a blend designated 76030 was sold by a company called Baker Petrolite to the Aragon Refinery. That blend purportedly contained a high molecular weight DADMAC polymer, which was purportedly used to clarify water drawn from the Ohio River, which purportedly had an alkalinity of less than 50. That infringement story is a house of cards. First, the only evidence offered at trial of any material sold by a company called Baker Petrolite to the Aragon Refinery was a $926 invoice for a material designated 76025, which Baker Petrolite's own documents show is a blend of aluminum chloride and water. It had no DADMAC. Secondly, Mr. Stoll, who was offering the testimony on this portion of their infringement case, conceded. He never spoke to anybody at the Aragon Refinery, so he's simply speculating that they were drawing water from the Ohio River. Third, the only basis Mr. Stoll had... I see I'm into my rebuttal time. Let me just finish. The only basis Mr. Stoll had to conclude or to opine water drawn from the Aragon Refinery had an alkalinity of less than 50 was tests conducted over 15 years ago, 50 miles away. That's hardly substantial evidence of direct infringement. If there are no further questions, I'll reserve my rest of the time for rebuttal. Thank you, Mr. Gallagher. Thank you. Mr. Vickery? Yes. Thank you. May it please the Court. This case was fairly tried in front of a jury. They had the burden of proving all of the facts relating to invalidity by clear and convincing evidence. They decided to go to the jury on all theories of invalidity including the priority date, the written description, anticipation, obviousness, etc., and lost. It was only after they lost that they decided that this would now be a matter of law. Prior to Richard Hasse, the conventional wisdom by those skilled in the art was that if you were going to combine aluminum chlorohydrate with an organic polymer, you would use a low-molecular weight DADMACC polymer. The voila moment, if you will, the inventive creation of Richard Hasse was that if you used a high-molecular weight polymer, you would have to use a bottle brush to illustrate it, both to the examiner and the jury, that the high-molecular weight DADMACC polymer would be like a handle on a brush and the aluminum chlorohydrate would be like the bristles, and that combination would clean water much more effectively, much more effectively than would aluminum chlorohydrate alone. And if, for example, you compare Exhibit 15, which counsel wants to talk about, with Exhibit 12 in HACIC 039, you see that there were indeed, as the examiner concluded and as Mr. Hasse testified in front of the jury, surprising and unexpected results. That's the reason that Richard Hasse got the patent, which of course is presumed valid. And the reason that there is an alkalinity limitation is because of the very thing that you pointed out, Judge Prost, that as the examiner considered the 039 patent, what HACIC had done is test ranges of 60 and above. But the claim was... The examiner, by the way, I know the 039 and the other HACIC patent is listed on the... But there's nothing in the prosecution history to demonstrate that the examiner actually considered... Yes, there is, Your Honor. Let me direct you to it. Is this the 039 patent? Yes, ma'am. The examiner signed off several times on 039 at JA 2155. The examiner... That's on the parent application. The examiner's the one that actually found the HACIC 039 and he cited it as a reference. At JA... And that's in 98. A year later, in 99, at JA 2154, they were now in the CIP application and the examiner signed off, I have considered this. What the examiner did not do, which really strengthens our case rather than weakens it, he did not issue an office action rejecting the claim for obviousness or anticipation in light of the HACIC 039. Can I ask you about... The district court here on J Maul dealt with both the anticipation and the obviousness questions and as I understood it, so you can correct me if I'm wrong, his reliance was on the evidence regarding teaching away. Is it not true that that has really little or no relevance to the anticipation question? That is certainly true. He reached the right result. He made an error in that statement in the opinion that the teaching away is the reason for it. But it still doesn't matter because, as you pointed out yourself in questions at council, there is no alkalinity limitation in the HACIC patent and for anticipation you've got to have a single reference that embodies everything. I mean, it's 150 or less, which includes and encompasses the 50 or less, right? Well, that's true, but all of his test results were 60 and above and, as Your Honor pointed out, the case we cited, the Attafina case from this court, discusses that very issue. The question is whether or not those numbers in Attafina and what they were talking about in terms of a temperature range necessarily constrains us here, given the details of this case, right? Yes. Here we've only got a difference of 10 between the example and the patent, right? That's true. That's true. But I submit that that's the very reason that the examiner ultimately imposed the limitation of 50 or below. Claim 1 of the parent application had no alkalinity limitation whatsoever. So it was a broader claim when it was first filed and would apply to any water, regardless of alkalinity. It was only during the prosecution of the patent that it was narrowed, which is why the priority date argument falls on its face with regard to alkalinity. It falls on its face with regard to basicity because the parent patent from all along focused on the use of aluminum chlorohydrate, which by definition has a basicity of 50 or less, as both Hasse and Mr. Stoll testified at the trial. Now, there is one point I want to make, and I mainly want to answer the court's... If the example were to say 49 instead of 60, then you would have an anticipation problem here? If the example was not 60, but rather 49? It would be possible. It would be possible for a jury to conclude that that was clear and convincing evidence which showed anticipation. But that, again, is their burden because the patent is presumed valid because the examiner... Well, is it possible, or would we have to say, even on JMAL, that you have to conclude it was anticipated because then the example would disclose every single element identified in the claim, and we've already agreed that teaching away is not relevant to anticipation. So I don't like your possible answer because it doesn't seem to be consistent with our case law. Our case law would seem to say that, yes, they'd have to conclude anticipation, and JMAL would be awarded if it wasn't. Now, I realize these are not the facts of your case, but I just want to be clear about what we both understand the law to be. I think we both understand the law is that teaching away is not the appropriate way to get around anticipation. Judge Davis was wrong when he said that. But I think we both also understand that anticipation is generally a question of fact, and that they have the burden of proof. Every single element was clearly disclosed in the example. I mean, the only element missing from the example is 50 or less. You've never pointed to anything else or argued to the jury there was something else missing, did you, from the example? That's true. Right. So the only example, the only element missing or argued to the jury was 50 or less, and I'm just saying if that were actually present, if the facts of the example were changed, wouldn't you then have to acknowledge there's anticipation? I'm struggling because of the burden of proof, Your Honor. I mean, I think that the Supreme Court's opinion... Why would it matter whether the burden of proof was preponderance, Davis? If the example actually completely and utterly disclosed every example in dispute, every element of the claim in dispute. Well, if it were laid out clearly so that one skilled in the art could look at that, I mean, it's still a question of fact of whether one skilled in the art reading that example would know that the way to really clarify water is to do this thing which nobody had been doing and which was completely counterintuitive. Wait a minute. If you're telling Judge Moore that 49 won't do it, then are you suggesting that if the anticipatory reference had 50 or less, which is precisely what the patent has, that 2 would not necessarily be anticipatory? Good point. We're in a hypothetical question. If hypothetically the HACCP patent clearly taught that an alkalinity limitation of 50 or less and DADMACC polymers of a million or more combined with aluminum chlorohydrate, then you've got a real anticipation problem. So if it identifies 49 as Judge Moore opposed, that 2 would be anticipatory, right? I think you're right. I apologize, Your Honor. Maybe I'm a little scatterbrained in not following your question and your reasoning, but I think that's true. But the point is that neither HACCP nor the Dentel article, which of course the author concluded didn't teach anybody how to do anything, neither of them fully disclosed the steps here. And that the question of invalidity is an issue that was tried to the jury and one as to which they bore the burden of proof by clear and convincing evidence. Let me just ask you a quick question on this waiver on waiver that we covered with your friend here. Do you kind of agree that under Fifth Circuit law, the Thompson case and so forth, that there's a problem here in terms of which makes it distinguishable from other cases? I do agree that it can be distinguished, that there can be, as Judge Moore said, a waiver of a waiver. That doesn't necessarily mean that the court has to find that in this case there's been a waiver. Well, we're required to follow Fifth Circuit law, right? You are, but the Fifth Circuit law, it says in the case before it, the court found a waiver of a waiver and that's fine. But it doesn't say in every circumstance where you do not raise it in response to the 50B motion that you have thereby waived it as a matter of law. Waiver is an equitable doctrine and each case turns on its own facts and it's abundantly clear, abundantly clear, that on all of the invalidity issues, the defendants made a tactical decision at trial to go to the jury. The jury was instructed adequately and correctly by Judge Davis, who tried the I-4-I case as well, on the law regarding invalidity, and it was only after they lost that that then they said, ah, aha, it's a matter of fact. But I agree certainly that the court could easily look at this and say, well, Vickery, you didn't object at the 50B stage. You waived the waiver. There's one point that I'd like to make on trade secrets. I realize that's a segue away from what we're talking about, but if we give sanctity to the constitutional prerogative of the jury to decide facts and if the standard of review on the JMOL is de novo, giving us the benefit of all inferences and credibility determinations regarding the evidence, then the JMOL of the trade secrets simply can't stand. There was ample evidence that this was a secret. The one thing that's not clear from the briefing, they cite Enright Bass. The secret, the so-called secret, was publicly disclosed by Hatchett, was it not? I mean, that's what the judge concluded. That's what the judge concluded, Your Honor, but he ignored the Texas law. He ignored two things. One, he said, gosh, you didn't bring this up until post-verdict, and we pointed out that we brought it up start to finish in the evidence as well as in the arguments of counsel, but he also ignored Enright Bass, the Texas case that they cite on appeal because that case says in Texas we follow the restatement rule of the six elements that relate to a trade secret, and here's the key finding. They seize on one of those six and say, aha, it's not a secret because Hasek taught it, as if any one of the six is a sine qua non. But the Bass case says we agree with the restatement and the majority of jurisdictions that a party claiming a trade secret should not be required to satisfy all six factors because trade secrets do not fit neatly into each factor. So in other words, even if you completely conceded that, gosh, if someone went and found this innocuous little patent and they read example 15 and they said, wow, that really works, doesn't work as well as ACH alone, but it does work, so all of a sudden this secret that this is what really works well and is out, the cat's out of the bag, even if you completely conceded that, which I don't have to do, it doesn't matter under the Texas law because I don't have to satisfy all six elements. All that would do is say one of the six elements isn't satisfied because out there there's this patent that someone could have found, no one did, but someone could have found it and could have learned from it that this is a combination that would work. So because of that, I submit that the JMOL was erroneous, that there's clearly evidence to support the jury's determination that they misappropriated a trade secret. I mean, goodness gracious, this 14681 product that they say, oh, we were selling all along, we were selling it since 1994, they went to get their ARF for it from the National Sanitation Foundation four months after Richard Hossie taught them about this blend, and I can give you the reference on that too. It's JA 100489. So, I mean, they could have been selling it before they were authorized by the National Sanitation Foundation to do it because that would be unlawful to do so, and they did it four months after he taught. So there's compelling evidence that this knowledge, that this counterintuitive epiphany was communicated in confidence and in trust to Pearl River. Mr. Rosenketter admitted that they accepted it and agreed to hold it in trust. Mr. Carlson, their corporate representative, denied it until the trial, but he admitted in trial, well, yeah, we agreed to hold this in confidence. Four months after this secret is disclosed, they're out there trying to get a product authorized to be sold, and then they start teaching all of the competitors how to do it. So the misappropriation is clear to me, and that's, of course, half the damages, the fairly meager damages on the evidence before them that the jury found in this case, and I urge the court to reverse that. Thank you, Mr. Bickering. Thank you, Your Honor. And thank the court for accommodating this first. Thank you. Mr. Gallagher, you have just over two minutes. A few points. I'll try to be brief. With respect to the trade secret dispute, Inouye Bass holds information that has been divulged in a published article or in a publicly filed patent cannot be subject to a trade secret. The trade secret is defined below as the use of ACH, a high molecular weight DADMAC, to clarify water. That's example 15. That was disclosed to the public eight years before Mr. Hasse started working in this area. With respect to the unexpected results and whether or not the examiner was actually considering the 039 patent, I think going through the entire prosecution history, you'll see although the examiner signed off on an IDS, which listed the 039 patent as one of, I don't know, 10 patents that were submitted. If we go to JA 1964 to 1972, in which the examiner said in the interview statement there were unexpected results, the unexpected results were compared with the 457 patent. Particularly if you go to JA 1966, we start talking about Hasek's tests 79 and 80. Well, there are not 80 examples in the 039 patent. There are 80 examples in the 457 patent. So if you look at what the examiner was applying to what Mr. Hasek, the pending claims that Mr. Hasek submitted to the patent office, it's clear that the 457 patent was the focus of the examiner's rejection. And that disclosed a DADMAC polymer and a salt, not aluminum chlorohydrate, ACH. I think your time has expired. So on that note, we'll conclude and we thank both counsel. Thank you very much for your time.